UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

        v.

EDWARD D. SWANSON,

              Defendant.

_____/

Criminal No. 2:23-cr-20699-02

Hon. Gershwin A. Drain

## UNITED STATES' SENTENCING MEMORANDUM FOR EDWARD D. SWANSON

For more than half a decade, Defendant Edward D. Swanson (the "Defendant") participated extensively in two separate bid-rigging conspiracies that enabled his company, co-defendant Al's Asphalt Paving Company, Inc. ("Al's Asphalt"), to win more than $3.6 million in asphalt paving services contracts. The conspiracies affected dozens of projects and victims. The Defendant both personally rigged numerous bids and managed and supervised other Al's Asphalt employees' participation in the conspiracies, corrupting the competitive bidding process and undermining the basic, but essential, notions of free and fair competition. In doing so, the Defendant violated the Sherman Act, 15 U.S.C. § 1, and for the reasons set forth in this sentencing memorandum and its Combined Motion and Brief for Downward Departure Under U.S.S.G. §5K1.1. (Dkt. 31), the United States recommends that the Court impose a term of imprisonment of 13.5

months, a $36,577.48 criminal fine payable in full before the 15th day after the date of judgment, a $100 special assessment for each count of conviction, and no order of restitution.

## I.      Offense Background

At various times during both bid-rigging conspiracies, the Defendant was the Vice-President, President, and majority owner of Al's Asphalt, an asphalt paving company based in Taylor, Michigan.  Al's Asphalt provided a range of asphalt paving services, such as large driveways, parking lots, and private roadways. Potential customers would solicit bids from providers of asphalt paving services such as Al's Asphalt, typically requiring bids from at least two or more providers. The potential customer would award contracts for asphalt paving services after first reviewing and evaluating bids submitted by the providers.

From at least as early as March 2013 and continuing until at least as late as November 2018, the Defendant and Al's Asphalt conspired with Asphalt Specialists, LLC ("ASI") and other co-conspirators to rig bids for contracts to provide asphalt paving services in the State of Michigan.  In addition, from at least as early as June 2013 and continuing until at least as late as June 2019, the Defendant and Al's Asphalt also conspired with F. Allied Construction Company, Inc. ("Allied") and other co-conspirators to rig bids for contracts to provide asphalt

paving services in the State of Michigan.  The Defendant has pleaded guilty to his participation in both conspiracies.  (Plea Agreement, Dkt. 20.)

The two conspiracies operated in much the same way.  In furtherance of the respective conspiracies, the Defendant and other officers and employees of Al's Asphalt engaged in conversations and communications with their ASI and Allied co-conspirators about which contracts each company wanted to win and agreed to rig bids in each other's favor.  The co-conspirators shared price-related information, including bid submissions, so that the agreed-upon losing co-conspirator could craft a higher-priced non-competitive bid, which it then submitted to the customer.  As a result, the agreed-upon winning company would indeed get the contract.  Al's Asphalt, ASI, and Allied each provided asphalt paving services and accepted payments under contracts obtained through this collusive and non-competitive process.  Al's Asphalt was paid $1,780,549 for projects that it rigged with ASI, and $1,877,199 for projects that it rigged with Allied.

The victims in this matter are customers that paid Al's Asphalt, ASI, and Allied for asphalt paving services projects that were awarded to the three companies via rigged bids in furtherance of the two respective conspiracies.  The United States has identified 40 such organizational victims.

## II.   The Defendant's Properly Calculated Guidelines Range is 18-24 Months' Imprisonment

The United States objects to the offense level calculations set forth in the PSR insofar as they do not include a three-level increase under U.S.S.G. §3B1.1 for the Defendant's role in the offense as a manager or supervisor. See PSR ¶¶ 32, 34, 36, 37, 38, 78. The United States' calculation of the Defendant's offense level is set forth in the following table:

| Description | U.S.S.G. § | Points |
|---|---|---|
| Base Offense Level | 2R1.1(a) | 12 |
| Conduct Involved Non-competitive Bids | 2R1.1(b)(1) | +1 |
| Volume of Commerce Attributable to the Defendant: $1M − $10M (stipulated to be $3,657,748) | 2R1.1(b)(2)(A) | +2 |
| *Aggravating Factors* | | |
| Role in the Offense | 3B1.1(b) | +3 |
| *Downward Adjustments* | | |
| Acceptance of Responsibility | 3E1.1(a) | -2 |
| Timely Notification of Intention to Plead | 3E1.1(b) | -1 |
| **Total Offense Level** | 15 | |
| Guidelines Months of Imprisonment Range, Criminal History Category 1 | 18 – 24 months | |
| Guidelines Fine Range 1% - 5% of Volume of Commerce | $36,577.48 – $182,887.40 | |

## A. The Defendant Served as a Manager or Supervisor of the Conspiracies

Section 3B1.1(b) of the Sentencing Guidelines calls for a three-level increase in a defendant's offense level if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ."  Although five or more participants must be involved in the criminal activity for a defendant to be eligible for the enhancement under §3B1.1, each of the five participants need not be subordinate to the defendant.  United States v. Bingham, 81 F.3d 617, 629 (6th Cir. 1996).

The Application Notes list the factors that the Court should consider in its assessment of a defendant's role and include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. §3B1.1, app. n.4.  "A district court need not find each factor in order to warrant an enhancement" under §3B1.1.  United States v. Castilla-Lugo, 699 F.3d 454, 460 (6th Cir. 2012).

Here, the Defendant meets the Guidelines' criteria to qualify for the manager/supervisor enhancement.  The Defendant played a significant role in the conspiracies, rigging bids on behalf of Al's Asphalt and meeting with co-

conspirators to discuss the collusive relationship between their companies.  In his role as Al's Asphalt's Vice-President and then President, the Defendant oversaw the company's business activities and generally exercised control and authority over other Al's Asphalt employees, including those who participated in the conspiracies.  The Defendant was well aware that Al's Asphalt employees, including Individual 1, were rigging bids in furtherance of these conspiracies even if he was not personally involved in every rigged bid.  Given the significant authority he possessed, the Defendant could have terminated Al's Asphalt's participation in the conspiracies.  But he only did so after he learned in late 2018 of the United States' investigation into the asphalt paving industry.

The Defendant was extensively involved in rigging bids in furtherance of both conspiracies.  He personally reached out to his co-conspirators at ASI and Allied and asked them to bid higher for asphalt paving contracts that Al's Asphalt wanted to win, sometimes emailing them Al's Asphalt's bid sheets and specifying how much higher their non-competitive bids should be.  He also obliged these same co-conspirators when they asked him to provide non-competitive bids in their favor, even going so far as to receiving a co-conspirator's pre-filled bid so that he could print it on Al's Asphalt's letterhead for submission.

Moreover, the Defendant was the highest-level conspirator from Al's Asphalt.  With respect to Al's Asphalt's conspiracy with ASI, for example, the

Defendant and an Al's Asphalt employee, Individual 1, met multiple times with their ASI co-conspirators in approximately 2015 and 2016 to discuss the collusive relationship between the companies. The Defendant (who at the time was the company's Vice President) was the highest-ranking representative from Al's Asphalt to participate in these meetings. Similarly, the Defendant and Individual 1 met with their Allied co-conspirators in 2019. By that time, the Defendant had become Al's Asphalt's President and majority owner, again making the Defendant the highest-ranking representative from Al's Asphalt at a meeting with co-conspirators.

As the highest-ranking Al's Asphalt co-conspirator, the Defendant's participation in these meetings was significant because it signaled to his co-conspirators, including Individual 1, his blessing of the understandings reached during those meetings that Al's Asphalt would abide by. For example, at one such meeting, the Defendant and Individual 1 discussed with their ASI co-conspirators projects that ASI wanted to win and did not want Al's Asphalt to compete for. The Defendant's participation and agreement in these types of discussions set the parameters within which he, Individual 1, and other Al's Asphalt conspirators would proceed in furtherance of the conspiracy, demonstrating a degree of control and authority commensurate with his role as a manager and supervisor in the conspiracy.

Furthermore, as the highest-ranking Al's Asphalt representative to participate in the conspiracies, and given his otherwise substantial authority and oversight within the company, the Defendant could have terminated Al's Asphalt's participation in the conspiracies at any point. Yet the Defendant only did so after he learned of the government's investigation in late 2018. For example, once the Defendant learned that the government was investigating the asphalt paving industry, he informed at least one of his ASI co-conspirators of the investigation. After that point, there is no evidence of further bid-rigging conduct between Al's Asphalt and ASI, underscoring the Defendant's control over his company's, and subordinates', participation in that conspiracy. Similarly, while meeting together with Individual 1 and their Allied co-conspirators in early 2019, the Defendant told his Allied co-conspirators that Al's Asphalt would no longer participate in bid-rigging with Allied. The companies' final rigged bid occurred shortly thereafter, after which they apparently ceased rigging bids entirely, again demonstrating the degree of control and authority that the Defendant exercised over Al's Asphalt's and its employees' participation in the charged conspiracy with Allied.

Furthermore, the Defendant became Vice-President in 2015, and then President and majority owner in 2018. As a high-ranking executive and then majority owner of Al's Asphalt during at least part of the charged conspiracies' relevant periods, the Defendant was presumptively entitled to a greater share of the

conspiracy's fruits than other Al's Asphalt-affiliated conspirators. The Guidelines do not require a specific accounting of the money, funds, or other benefits that the Defendant received from the rigged contracts; it only requires that the Defendant was entitled to a greater share of Al's Asphalt's ill-gotten gains. See U.S.S.G. §3B1.1, app. n.4. By the nature of his significant roles in the company's organizational hierarchy as executive and majority owner, the Defendant was so entitled.

The manager/supervisor enhancement still applies here even if the Defendant did not know about every rigged bid that his subordinates submitted. The Defendant does not dispute that he knew that subordinate Al's Asphalt's employees, including Individual 1, participated in the bid-rigging conspiracies, although he notes that he "did not review employee bids on a regular basis" PSR ¶ 13. But even accepting this general assertion as true, it is irrelevant as to the specific question of the Defendant's role in the conspiracies. It does not matter that the Defendant did not have his personal fingerprints on every rigged bid that an Al's Asphalt employee submitted; they were nonetheless submitted on behalf of Al's Asphalt under the Defendant's control and authority, as described above.

Moreover, the Defendant's knowledge of antitrust law, or lack thereof, does not diminish his role as a manager or supervisor over other participants in the illegal conspiracies. It does not matter whether the Defendant appreciated that his

participation in seeking and receiving non-competitive bids constituted an illegal conspiracy.  As the Guidelines make clear, the §3B1.1 analysis centers on the objective facts surrounding the Defendant's participation in the conspiracies, not his subjective thought process in doing so.  As described throughout this section, here the objective facts are clear.  The Defendant participated extensively in two bid-rigging conspiracies.  Other Al's Asphalt employees such as Individual 1 also participated in the bid-rigging conspiracies under the authority of the Defendant in his role as executive and majority owner.  These facts are more than sufficient to establish that the Defendant served as a manager or supervisor of at least one other participant of the conspiracies.

Finally, the parties agree that the charged conspiracies each involved at least five participants.  Plea Agreement, ¶¶ 4(a)(ii), 4(b)(ii).

For the foregoing reasons, the United States submits that the Court should apply a three-level manager/supervisor enhancement under U.S.S.G. §3B1.1(b).

### B. The Defendant's Total Offense Level Should be 15

After application of the three-level manager/supervisor enhancement under §3B1.1(b), the Defendant is eligible for a three-level reduction for acceptance of responsibility under §3E1.1.  Therefore, the Defendant's total offense level should be 15, which is in Zone D and carries an imprisonment range of 18 – 24 months.

### III.   The PSR Properly Calculates the Defendant's Guidelines Fine Range

The United States agrees with and has no objection to the Guidelines fine range calculations in the PSR.  The Defendant's fine range is $36,577.48 to $182,887.40.  PSR ¶ 88; see also Plea Agreement, ¶ 9(e).

### IV.   Recommended Sentence

The United States respectfully recommends that the Court impose a sentence of 13.5 months imprisonment and a $36,577.48 criminal fine.  For the reasons set forth in the United States' Combined Motion and Brief for Downward Departure under U.S.S.G. §5K1.1 (Dkt. 31), the recommended sentence reflects a twenty-five percent downward departure from the bottom of the Guidelines imprisonment range under a total offense level of 15.  The United States respectfully submits that the recommended sentence is sufficient but not greater than necessary to meet the stated sentencing goals and factors set forth in 18 U.S.C. § 3553(a).

### A. The Recommended Sentence Satisfies 18 U.S.C. § 3553(a)

In addition to considering the Guidelines, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a) in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet the specified sentencing goals.  The most relevant factors include the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence, see 18 U.S.C. § 3553(a)(2)(A)-(B), and the nature and circumstances of the offense and

the history and characteristics of the Defendant, id. §3553(a)(1).  A term of 13.5 months imprisonment and a $36,577.48 criminal fine is sufficient, but not greater than necessary, to achieve those objectives.

### i. Imposing the recommended custodial sentence recognizes the seriousness of the offense and promotes respect for the law

The Defendant's violations of the Sherman Act are serious because they attacked the basic principle of competition integral to our economic system.  As the Sentencing Commission (the "Commission") recognizes, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm." U.S.S.G. § 2R1.1 cmt. background.  The Defendant's two bid-rigging conspiracies are no exception.  Asphalt paving services contracts were tainted by the conspiracies while customers lost the benefit of free competition.  The Defendant and his co-conspirators, however, reaped the benefits of their conspiracies to the tune of millions of dollars paid on rigged contracts:  Al's Asphalt won over $3.6 million in rigged contracts while helping ASI and Allied win rigged contracts worth over $12 million combined.

The seriousness of the Defendant's conduct cannot be understated.  He was not a passive participant in the conspiracies. He personally sought, received, and provided numerous non-competitive bids with his ASI and Allied co-conspirators.

He also participated in meetings with co-conspirator executives in which non-competitive bidding was discussed. His mere involvement in the conspiracies, especially after he became Vice-President in 2015 and President/majority owner in 2018, gave his co-conspirators the confidence to collude with Al's Asphalt knowing that the company was committed to the criminal conspiracies from the top-down. Moreover, as already noted, he served as a manager and supervisor in the conspiracies on behalf of Al's Asphalt and set the tone for other Al's Asphalt participants.

The Defendant's participation in the bid-rigging conspiracies were clear violations of law, the seriousness of which cannot be mitigated based on who requested the non-competitive bids. The Defendant notes that "**[s]ometimes** [he] asked competitors for [non-competitive] bids at the direct request of customers who were struggling to get other service providers to bid on their jobs." PSR ¶ 18 (emphasis added). Who requested the bids is irrelevant; bid-rigging is illegal, full-stop. Furthermore, the Defendant's statement itself concedes that such customer requests did not comprise the full universe of non-competitive bids that the Defendant sought or provided. To believe otherwise would ignore the many customers, general contractors, and other project intermediaries who were unaware of the conspiracies and expected the Defendant and his competitors to submit legitimate, competitive bids to win their business.

Moreover, the Defendant chose to ignore the real-world impact of his conduct as the harm it caused was self-evident even without the benefit of formal antitrust training.  While he received and provided non-competitive bids, the Defendant knew that, in a free market, competitors must compete.  He knew that his coordination with competitors on non-competitive bids corrupted that ideal and ultimately cheated customers.  The Defendant asserts, however, that he did not appreciate at the time that seeking or providing non-competitive bids was wrong or illegal.  PSR ¶ 19, 24, 51.

Yet, in his statements to Probation, the Defendant acknowledged that he "recognizes that his behavior may have caused Al's Asphalt's customers to pay more for paving services than they might have paid to a competitor if that competitor had submitted their very best bid" and that "customers could have paid less if his competitors had submitted competitive bids that were lower than Al's." PSR ¶ 20.  The Defendant also expressed regret that "he did not provide Al's Asphalt's very best bids to [his competitors'] customers." PSR ¶ 21.  These could not have been recent revelations.  The Defendant has worked in the asphalt paving industry since 1993 and started estimating asphalt jobs in around 2012.  PSR ¶ 13. Over his many years in the industry, he saw first-hand the difference between legitimate, competitive bids and the rigged bids that he received from and provided to ASI and Allied.  His experience on the job taught him that a rigged bid is not the

14

"very best bid."  The wrongness of the Defendant's conduct and the resulting harm to customers were self-evident—even if he chose to disregard them.

Finally, the recommended sentence promotes respect for the law.  A non-custodial sentence would contribute to the unfortunate perception that white-collar defendants are treated more leniently than blue-collar criminals.  Imposing the recommended custodial sentence would counter this harmful perception and demonstrate that all defendants are on the same playing field in the eyes of the criminal justice system.  Furthermore, a custodial sentence also would underscore the significant role that the Sherman Act serves in our nation's economy and the importance of abiding by it.

Accordingly, the United States' recommended custodial sentence properly accounts for the seriousness of the Defendant's conduct and promotes respect for the law.

### ii.  Imposing the recommended custodial sentence on the Defendant provides both specific and general deterrence

A custodial sentence of 13.5 months will provide adequate general and specific deterrence.  The Defendant continues to work in the asphalt paving industry as Al's Asphalt's President and majority owner.  In this role, the Defendant may find himself in situations similar to those that gave rise to the instant offenses, including receiving requests to submit or seek non-competitive

bids.  The United States' recommended sentence will adequately deter the Defendant from again choosing to be on the wrong side of the Sherman Act.

The recommended sentence also provides for general deterrence.  "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) (quoting United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)).  Antitrust defendants frequently participate in antitrust conspiracies calculated to boost profits, take shortcuts, and subvert free and open competition.  Thus, a non-custodial sentence may appear to the average antitrust defendant as merely the cost of doing business and undermine the need for deterrence.  Adding the prospect of imprisonment to a would-be antitrust violator's cost-benefit analysis in deciding whether to collude with competitors serves as a significant deterrent against doing so.

Furthermore, the threat of imprisonment as a general deterrent is necessary because bid-rigging is a particularly difficult crime to detect.  Illegal conduct that enriches offenders while minimizing the risk of detection is especially pernicious and requires strong sentences to deter it.  See United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to

detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it" (internal citation omitted)). Given the immense effort that it takes to discover and prosecute bid-riggers like the Defendant, a custodial sentence is necessary to adequately deter future would-be violators.

A combination of a custodial sentence and criminal fine furthers deterrence. Here, the need for adequate general and specific deterrence weighs in favor of imposing the United States' recommended sentence.

### iii. The recommended custodial sentence appropriately reflects the history and characteristics of the Defendant and the nature and circumstances of the offense

The Defendant's net worth is over two million dollars. PSR ¶ 72. Additionally, his current annual salary is $240,000. PSR ¶ 64. Given his income-generating potential and assets, a sentence of imprisonment likely will have a far greater impact on him than a monetary fine alone.

Also, based on the information submitted by the Defendant to Probation, the Defendant appears to have grown up in a positive environment, has close familial connections, and was not subject to any abuse or neglect. PSR ¶¶ 44–46, 59. As an adult, he had a successful career in the asphalt paving industry. Even with all the benefits afforded to him due to his upbringing and career success, however, the Defendant committed serious felonies. The Defendant both received and provided

non-competitive bids as part of two separate bid-rigging conspiracies spanning many years.  As a result, the Defendant's company and co-conspirator companies were paid millions of dollars on tainted contracts.  The Defendant could have terminated his and his company's involvement in the conspiracies and ceased the criminal activity prior to the end of the relevant periods, but he did not.  Instead, the Defendant repeatedly chose to violate the law.  The Defendant's actions are particularly worthy of punishment due to his prominent role in the conspiracies as Vice-President and then President and majority owner of Al's Asphalt.  Accordingly, the Defendant's personal history and characteristics, as well as the nature and circumstances of the offense, support the United States' recommended custodial sentence.

    iv.  **Imposing the recommended sentence of imprisonment is consistent with pertinent policy statements regarding antitrust offenders**

Pertinent policy statements issued by the Commission support the United States' recommended sentence.  The Court should consider these policy statements as a factor under 18 U.S.C. § 3553(a)(5).  As previously noted, the Commission recognizes that restrictive agreements like bid-rigging can cause "serious economic harm."  U.S.S.G. §2R1.1 cmt. background.  Accordingly, the Commission believes that "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of [antitrust] cases that are prosecuted, including all bid-rigging

cases." <u>Id.</u>  Moreover, the Commission has "concluded that the definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm." U.S.S.G. Ch. 1 Pt. A(4)(d). Similarly, "[s]ubstantial fines are [considered by the Sentencing Commission to be] an essential part of the sentence." U.S.S.G. §2R1.1 cmt. background.  The Commission's statements on the imposition of imprisonment and substantial fines for offenders like the Defendant clearly reflect its views that the seriousness of the Defendant's Sherman Act violations justify the United States' recommended sentence in this case.

> ### v. Balancing the relevant factors, the recommended sentence is sufficient but not greater than necessary to achieve sentencing objectives

The Defendant's illegal conduct was extensive and corrupted the competitive process for many years.  Accordingly, his sentence must appropriately address the sentencing objectives of § 3553(a).  The United States submits that its recommended sentence of 13.5 months imprisonment, a $36,577.48 criminal fine, and a $100 special assessment per count of conviction is sufficient but not greater than necessary to achieve those objectives.

## V.      Restitution is Discretionary

The Mandatory Victim Restitution Act does not mandate restitution for Title 15 offenses, including the Sherman Act, but only for crimes of violence and certain offenses under Titles 18 and 21. 18 U.S.C. § 3663A(c)(1)(A).  See PSR ¶ 90. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, the United States has notified the Defendant's victims of these proceedings.  The parties have agreed to recommend the Defendant's sentence not include a restitution order.  Plea Agreement, ¶ 12.

## VI.     Conclusion

For the foregoing reasons, the United States respectfully requests that the Court : 1) include a three-level enhancement based on the Defendant's role as a manager or supervisor of the criminal conspiracies charged in this case; 2) impose a sentence that includes a term of imprisonment of 13.5 months; 3) order the Defendant to pay a $36,577.48 criminal fine payable in full within 15 days of the judgment; 4) order the Defendant to pay a $100 special assessment for each count of conviction; and 5) not order restitution.

Respectfully submitted,


*/s/ Ruben Martinez, Jr.*

Ruben Martinez, Jr. (TX 24052278)
Allison M. Gorsuch (IL 6329734)
Melanie G. Wegner (IL 6324826)
Trial Attorneys

Michael N. Loterstein (IL 6297060)
Assistant Chief

U.S. Department of Justice
Antitrust Division
209 S. LaSalle St. Suite 600
Chicago, Illinois
Tel: 312-984-7200


Dated: May 31, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2024, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.

*s/Ruben Martinez, Jr.*
Ruben Martinez, Jr., TX 24052278
Trial Attorney
U.S. Dept. of Justice,
Antitrust Division
Chicago Office
209 S. LaSalle, Suite 600
Chicago, IL 60604
312-754-3932
Ruben.Martinez@usdoj.gov

Dated: May 31, 2024